**William R. WATTS, Appellant,**

v.

**The UNIVERSITY OF DELAWARE, an agency of the State of Delaware.**

No. 79–1997.

United States Court of Appeals, Third Circuit.

Argued March 25, 1980.

Decided May 1, 1980.

E. Leigh Hunt, (argued), Wilmington, Del., for appellant.

C. Walter Mortenson, E. Alan Uebler, (argued), Mortenson & Uebler, Wilmington, Del., for appellee.

Before ROSENN, GARTH and SLOVITER, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

This is an appeal by William Watts from the grant of summary judgment in favor of the University of Delaware declaring his patent invalid because the patented item

was in public use more than one year before the filing of the patent application. We conclude that a genuine issue of material fact exists as to whether the use of the patented item was for experimental purposes and therefore reverse.

## I.

William Watts is a furniture upholsterer and designer who, for a number of years prior to 1974, upholstered and repainted furniture for the University. Approximately in February 1974, Watts set out to design a chair unit which could be linked with other chair units and which would be more durable and easier to repair than the furniture then in use by the University. During the first week of April 1974, Watts completed drawings for the basic chair unit and delivered them to a furniture frame manufacturer in Philadelphia with instructions to construct a prototype and keep the drawings and prototype confidential. On April 29, Watts inspected the frame and directed that several minor changes be made. On May 30, Watts obtained the completed frame from the manufacturer.

Between February and early June of 1974 Watts conferred with officials of the University and discussed with them his idea for a new chair frame. Some factual disputes exist concerning the various meetings. However, the following chronology is undisputed. During February 1974 Watts informed Wayne Hurst, Assistant Director of the University's Maintenance Division, of his efforts to design a more durable chair. In mid-May Hurst and Stephen S. Showers, the Associate Director of Housing, visited Watts at his upholstery shop and discussed generally with him his work in designing a new chair unit. In early June, Watts at the personal request of Richard Blakeman, the University's Director of Purchasing, had the prototype chair frame delivered to him for his inspection. Watts did not offer to sell the chair, Blakeman did not offer to buy it, and Watts retrieved it later that day. Around the same time, Showers requested and obtained permission from Watts to test the chair unit for two weeks in a lounge being used by students in the College Try Program. In previous years students in the College Try Program had subjected the lounge furniture to very hard use. Watts agreed to the test.

Watts delivered the upholstered chair unit to the designated dormitory on approximately June 24, 1974. Watts and Showers each inspected the chair once during the time it was in the lounge. Showers suggested that drawings be made of the chair unit so that the University would have a record of it in the event of theft. Watts agreed and assisted in making sketches and providing the measurements. The chair was returned to Watts sometime in July 1974 and has since remained in his possession.

In November 1974, without prior notice to Watts that the University proposed to put the chair unit out for public bids, the University requested bids of furniture of the type designed by Watts. Despite his protest over the bidding procedure, Watts submitted a bid but the University awarded the contract to a competitor. Thereafter, Watts actively pursued a patent for his chair unit, submitting applications for design and utility patents on August 27, 1975. The patents, design patent Des 243,427 "Frame for a Seat" and utility patent U.S. 4,074,919 "Chair Frame Furniture Unit," were issued on February 22, 1977 and February 21, 1978. The chair frame described in the patents in suit is exactly the same as the chair frame used in the College Try Program. No changes were made in the design as a result of the June 1974 test.

Watts filed a two-count complaint in the United States District Court for the District of Delaware against the University. In Count I he alleged patent infringement and sought injunctive and monetary relief. In Count II he alleged breach of confidence by the University prior to the issuance of his patent and claimed monetary relief. According to Watts, the University spent over $150,000 between 1975 and the end of 1977 to purchase furniture of the type he designed. Watts further alleges that University official Showers has obtained a copy-

right on drawings of Watts' chair frame design and licensed a company to make and sell the furniture at a substantial royalty to the University.

The University filed motions for summary judgment on both counts. Watts filed cross motions for summary judgment. The district court: (1) granted the University's motion for patent invalidity on the ground the chair frame claimed in the patents was in public use more than one year before the filing of the patent application; (2) denied both motions for summary judgment on the breach of confidentiality count on the ground that a material issue of fact existed; and (3) denied the University's motion for attorney's fees. Watts appealed.[1]

## II.

The basis for the grant of summary judgment by the district court was 35 U.S.C. § 102(b) which provides in relevant part:

A person shall be entitled to a patent unless

(b) the invention was  . . .  in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States  .  .  . .

The applications for both patents in this suit were filed on August 27, 1975. The critical date for public use is therefore August 27, 1974. In granting summary judgment, the district court concluded that the use of the furniture in the College Try Program in June 1974 was a public use and thus the chair cannot be patented. *Watts v. University of Delaware*, 471 F.Supp. 1272 (D.Del.1979).

On this appeal Watts argues the use of the chair falls within the experimental use exception to the public use doctrine. In *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 24 L.Ed. 1000 (1878), the Court announced the experimental use exception. The patent in that case related to a new type of wooden block pavement. The inventor had constructed a 75 foot section of road on a public toll highway. For a period of six years before applying for a patent, the road section was used to test its qualities. The inventor financed the testing and made frequent inspections of the road. The Court held that the testing of the road was a valid experimental use because it was necessary to test the durability of the invention and to bring the invention to perfection. The Court noted that the project pursued with a *bona fide* intent of testing the qualities of the roadway, was a valid experimental use.

The public had the incidental use of the pavement, it is true; but was the invention in public use, within the meaning of the statute? We think not. The proprietors of the road alone used the invention and used it at Nicholson's request, by way of experiment. The only way in which they could use it was by allowing the public to pass over the pavement.

97 U.S. at 136.

In this case the district court concluded that Watts could not fall within the experimental use exception. It reasoned that the use of the chair by Watts in the College Try Program was not experimental because "plaintiff's primary intent was to commercially exploit his invention." 471 F.Supp. at 1281. Thus, the principal issue on this appeal is whether it can be said, as a matter of law, that the use of the chair in the College Try Program was a public and not an experimental use.

The University argues it is not necessary to examine Watts' intent under *Manning v. Cape Ann Isinglass Co.*, 108 U.S. 462, 2 S.Ct. 860, 27 L.Ed. 793 (1893), because the use of the chair was public, regardless of intent. In *Manning*, the patent covered an improvement in the process of making isinglass. The patentee caused one machine for practicing his process to be constructed and used for a period of about seven years by a company he jointly owned. In 1867, the

1. We are not foreclosed from entertaining this appeal despite the denial of the other orders because the effect of granting the University's motion for summary judgment for patent invalidity was to deny Watts' claim for injunctive relief. Watts appealed that grant of summary judgment under 28 U.S.C. § 1292(a)(1).

firm was dissolved and the machine was acquired by his partner who continued to use it in his new business in 1870, still prior to the critical date. The court held the patent invalid because the use of the machinery was not for an experimental purpose. We do not read *Manning* as standing for the proposition that intent is not relevant. In *Manning*, two additional commercial machines were set up and operated in another factory for commercial production without restrictions. The case involved clear commercial intent. Thus, the Court did not explore the intent of the patentee because the facts overwhelmingly showed a commercial purpose. In this case, Watts gave his chair to the University for two weeks concededly for testing. It is not clear from that fact whether his intent was experimental or commercial. Furthermore, unlike the instant case, *Manning* was a judgment after trial, not a grant of summary judgment. Therefore, the question of experimental intent versus commercial intent is crucial to a determination of this case.

■ The district court examined intent and concluded Watts' intent was commercial, not experimental. The court acknowledged that issues of intent are not well suited to disposition by summary judgment, *In Re Yarn Processing Patent Validity Litigation*, 498 F.2d 271 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), but nonetheless concluded that the record showed that Watts' intent was clear. On a motion for summary judgment, however, the court should take a view of the evidence most favorable to the party against whom the motion is directed, resolving "all inferences, doubts and issues of credibility against the moving party." *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972). The court relied primarily on the testimony of Watts at his deposition concerning his motive for showing the chair frame to employees of the University.

> BY MR. MORTENSON [defendant's attorney]:
>
> *        *        *        *        *        *

Q. What was the purpose of the trial basis?

A. To see whether they would be interested in it if it upheld or withheld the abuse of the students.

Q. If they were interested, were they free to go ahead and use it and adopt it?

A. I didn't give them that right.

Q. What was the purpose in giving them anything?

A. Well, if you was in business, wouldn't you try to promote a product?

Q. Why are you trying to promote the product?

A. Well, we all eat, I guess, don't we?

Q. In other words, you were looking for financial gain in your efforts there; were you not?

A. That's what you are in business for, isn't it?

Q. You were in business to offer this for sale to them; were you not?

A. That's right.

Q. If—

A. If they approved of it.

Watts Dep., pp. 26–27.

On appeal Watts cites many cases in support of his proposition that the University's use of the chair was experimental. For example, in *Utilities Service Inc. v. Walker*, 78 F.2d 18 (3d Cir. 1935), this court held that a seven year period of experimentation and testing in a commercial environment was reasonable under the circumstances for an automatic emergency electrical supply device. The court noted that the absence of an actual sale of the device is important in the consideration of whether or not the use is public. In *International Silver Co. v. Julie Pomerantz, Inc.*, 271 F.2d 69 (2d Cir. 1959), the court held that the showing of photographs of a patented design in connection with a market survey did not constitute a public use of the design. The University cites other cases indicating the use was public, such as the *Manning* case, *supra*. In all of these cases the intent was commercial rather than experimental. In

the cases cited by both parties the crucial issue was the inventor's intent.

The crucial issue in this case does not involve the parameters of the public use doctrine as much as it does the propriety of summary judgment. The district court in part relied on *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 872 (3d Cir. 1977), wherein this court stated:

> Once the party asserting invalidity has convincingly proven the prior use or sale, . . . the burden shifts to the patentee to prove that any prior use, sale, or printed publication was for experimental, not commercial, purposes. *Azoplate Corp. v. Silverlith, Inc.*, 367 F.Supp. 711 (D.Del.), *aff'd*, 506 F.2d 1050 (3d Cir.), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

In *Paeco*, however, there was a trial on the merits, not a motion for summary judgment. The district court here apparently believed that Watts had the burden of proof as to experimental use, even on a motion for summary judgment.

This conclusion is at variance with *DeLong Corp. v. Raymond International*, 622 F.2d 1135 (3d Cir., 1980), where this court discussed the relationship between burdens of proof at trial and on a motion for summary judgment in experimental use cases.

> When, however, the inventor has chosen to sell his invention more than one year prior to the date of the patent application the presumption is, in the absence of evidence to the contrary, that the experimental period is over and that the invention is suitable for commercial exploitation. The burden of proof then shifts to the inventor, for as the court stated in *Koehring Co. v. National Automatic Tool Co.*, 362 F.2d 100, 104 (7th Cir. 1966), "once a single use of an operative device embodying the invention prior to the critical date has been shown the inventor must carry the burden of proving that the use was a part of a bona fide program of experimentation." *On a motion for summary judgment, however, once the "experimental use" defense is raised by the patentholder, the burden is on the alleged infringer to demonstrate that no "genuine issue of material fact" exists with respect to such defense and that he is entitled to judgment as a matter of law. See e. g., Kelly Mfg. Co. v. Lillisten Corp.*, 180 USPQ 364 (E.D.N.C. 1973); *Bird v. Zimmerman Fur Institute, Inc.*, 294 F.Supp. 202 (S.D.Ohio 1968).

622 at 1144 (emphasis added). Thus, in this case the burden was on the University to establish that there was no genuine issue of material fact as to experimental use once Watts raised the issue.

■ We conclude that the University did not meet its burden of showing that there was no factual dispute because there remains an issue concerning Watts' intent in placing the chair in the College Try Program. The district court chose to rely on the equivocal testimony of Watts at his deposition, *supra* at 50. The court also cited an affidavit by Watts which appears to contradict part of the deposition. The affidavit stated:

22. My efforts with respect to the chair unit were other than charitable as upholstery work and furniture design is my livelihood. My purpose and motive in developing the chair unit of my invention acceding to Mr. Blakeman's request to see the frame, and consenting to the U. of D's request *to test the chair unit for two weeks in the College Try Program was in the hope of ultimately making a profit from the venture. I hoped that the chair unit would withstand the abuse of the Try Program in the Russell Dorm, or, in the event that it did not withstand the abuse of the Program, I could modify the frame* so as to prevent any particular part that did fail from failing in the future.

23. *It was my understanding from my course of dealing with the University that in the event the chair unit was satisfactory during the test in Russell, or if I could modify it to be satisfactory by alleviating any problems that developed during the test,*

*I would provide the University's needs of the furniture in the future.* At no time prior to November of 1974 was I ever told that the matter had to go out to bid. In the past, most of my work for the University had been done without any bid process being followed. I had never been given any document stating any bidding policies nor did I have any reason to believe that the matter had to go out to bid in the event the *University desired my chair units for their use or a modified design that may result from the test.*

(Emphasis added.) The district court said this affidavit was not inconsistent with the earlier testimony because Watts' "purpose was to determine whether his product was acceptable to the University—his intended customer." 471 F.Supp. at 1281. The court apparently disregarded a report memorandum of February 11, 1975, from Showers to Gilbert Volmi, in which Showers appears to confirm Watts' claim that he delivered the chair unit to the university dormitory for testing. Showers stated:

Mr. Watts returned after one week and we asked him if he was interested in an actual test of the chair. The College Try Program was in Russell [dormitory] and we asked Mr. Watts if he would care to subject his chair to a two week trial in that area. He readily agreed.

We believe the affidavit and Showers' memorandum sufficiently place the issue of experimental use in dispute. In the affidavit Watts indicated that he may have modified his design from the "test." The affidavit indicated that Watts wanted to test the chair; it also indicated that he ultimately wanted to make a profit. Watts did not show the chair to anyone else or offer it for sale.[2]

The district court concluded it was clear that the primary purpose of the College Try Program test was commercial because Watts hoped to sell the chair to the Univer-

sity. There is no doubt that profit motivated Watts' chairmaking venture. However, the mere desire to realize a profit sometime in the future in no way negates the inventor's intent to test his product in the present. The purpose of the experimental use exception is to allow an inventor an opportunity to perfect his invention. In this case Watts designed the chair specifically for sale to the University. That sale, however, could not take place unless the chair met certain qualifications. Thus, although Watts expected to sell the chair to the University, the two week trial period could well have been merely an experimental use to assure Watts that the chair would satisfy the University's needs.

We have observed before that issues involving state of mind and intent are not well suited to disposition by summary judgment, since much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder. *Alabama Great Southern R. R. v. Louisville and Nashville R. R.*, 5 Cir. 1955, 224 F.2d 1. Most courts are in agreement that issues involving state of mind are difficult to handle by summary judgment. 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2730. Also, since the experimental use exception involves weighing two different subjective motives, both of which might be established by the evidence, reasonable men might draw different inferences even from the same established facts. Therefore, the issue should be resolved by the fact finder after a full hearing of all the evidence rather than by summary judgment.

*In Re Yarn Processing Patent Validity Litigation, supra,* 498 F.2d at 288.

The district court cited *Atlas v. Eastern Airlines, Inc.,* 311 F.2d 156 (1st Cir. 1962), *cert. denied,* 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963), in support of its view that Watts' testimony conclusively removed

---

2. At oral argument Watts' attorney indicated that additional evidence would be produced at trial which would show that Watts refused to display the chair at a conference and turned down the opportunity to make a sale.

any doubt as to his intent in placing the chair in the University lounge. In *Atlas* the district court entered summary judgment of patent invalidity for the defendant concerning a device to permit radar contour mapping of rain intensity because American Airlines made public use of a similar device more than a year before the critical date. The appellate court affirmed the grant of summary judgment on the following grounds: (1) two American employees testified at deposition that the use was public; (2) American issued press releases dealing with the device; and (3) newsmen attended a testing of the device and wrote articles concerning the test. Thus, in *Atlas* every person involved with the device, with supporting evidence, claimed the use was public. Plaintiff's only contrary evidence was his blanket assertion that the test was experimental.

This case is far different. Here, the district court relied solely on ambiguous testimony of the inventor, a man of limited education. On the other hand, the signed memorandum of an informed University official, Showers, seems to confirm Watts' position that the purpose of the trial period was to test the chair. *Atlas* does not support the proposition that the district court was justified in determining intent as a matter of law under the facts of this case.

The district court also cited *Roller Bearing Co. of America v. Bearing, Inc.*, 322 F.Supp. 703 (E.D.Pa.1971), in support of the propriety of finding commercial intent as a matter for summary judgment. But, *Roller Bearing* is distinguishable because the defendant there proved five transactions involving either the sale or the offer to sell roller bearings while the plaintiff relied on a blanket unsupported claim of experimental intent. In this case, the University offered no evidence to rebut the showing of experimental intent.

We conclude that summary judgment should not have been entered under these facts. The University failed to meet its

burden of showing there were no undisputed material facts. The question of Watts' intent in placing the chair in the lounge is an issue of fact for trial.

### III.

We hold that it was error to grant the University's motion for summary judgment. The judgment of the district court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

Costs taxed against appellee.