102 F.Supp.2d 577 (2000)
Gina MORALES-EVANS, Plaintiff,
v.
ADMINISTRATIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY, William Coleman, Jr., Robert E. Battle, Phillip J. Hill, and Harvey M. Goldstein, individually and as employees of Administrative Office of the Courts of the State of New Jersey, Defendants.
No. Civ. 97-3214(JAG).
United States District Court, D. New Jersey.
June 30, 2000.
*578 Francis Obi, Irvington, NJ, for plaintiff Gina Morales-Evans.
Douglass L. Derry, Senior Deputy Attorney General, Karen M. Griffin, Deputy *579 Attorney General, Office of the Attorney General, Trenton, NJ, for defendants Administrative Office of the Courts, Bobby E. Battle, Phillip J. Hill, and Harvey Goldstein.
Paulette Brown, Duane, Morris & Heckscher, LLP, Newark, NJ, for defendant William Coleman.

OPINION
GREENAWAY, District Judge.
Presently before the Court are defendants' motions for summary judgment. Plaintiff Gina Morales-Evans ("Evans") alleges that she was sexually harassed by her supervisor, defendant William Coleman, during her tenure at the Administrative Office of the Courts ("AOC"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 et seq. ("LAD"), and state tort law.[1] For the reasons discussed below, defendants' motions are granted.

FACTS
The pertinent facts, taken in the light most favorable to Evans as the nonmoving party, are as follows: Evans was acquainted with Coleman prior to her employment with the AOC. Coleman was an adjunct professor at Essex County Community College ("ECCC") in Newark, New Jersey, where Evans was a clerical worker. See Evans 56.1 Statement ¶ 3. Evans spoke to Coleman and expressed an interest in enrolling in a course he taught at ECCC. See id. Coleman subsequently informed her of job openings with the AOC's Juvenile Intensive Supervision Program ("JISP"). See id. ¶ 4. Evans applied for a position and Coleman interviewed her. See Evans Exs. C, H, I, J, K. During the relevant time, Coleman was the Regional Supervisor for the JISP's Northern Region. Defendant Phillip J. Hill was the Director of the JISP; Coleman reported to Hill. Defendant Harvey Goldstein was Hill's supervisor. Defendant Bobby E. Battle was the Chief of the AOC's Equal Employment Opportunity Office ("EEO/AA").[2]See AOC 56.1 Statement ¶¶ 2-4.
Evans alleges that Coleman began harassing her in 1993 after she applied for a position with the JISP, but before she was hired. See Evans Ex. AAA, Evans Dep. at 22, Ex. BBB, Evans Dep. at 25. At ECCC, Coleman visited Evans' office daily to invite her to lunch or out after work. See Evans Ex. AAA, Evans Dep. at 22. During this period of time, Coleman told Evans that he wanted to hire and work with beautiful people and frequently joked about his aversion to working with "ugly people." Evans Ex. BBB, Evans Dep. at 25.
On at least one occasion, Coleman visited Evans' house uninvited. Evans believes Coleman got her address off her resume because she had never given it to him directly. See Evans Ex. AAA, Evans Dep. at 22. At some point during this time before Evans started at the JISP, Coleman invited her to a basketball game to "see him interact with the juveniles of the program." Id. When Evans exited her car upon arriving at the game, Coleman grabbed her hand to walk her inside. Evans immediately let go of his hand and left the game after five to ten minutes. See id.
Evans was hired as a "Secretarial Assistant III" with the JISP and started on or about October 18, 1993. Coleman and the personnel department notified Evans that she had been hired. See Coleman Ex. FF4, Evans Dep. at 79; AOC 56.1 Statement ¶ 1. In that position, she managed the office, supervised the JISP clerical *580 staff, and reported to Coleman. See Derry Cert. Ex. B, Evans Dep. at 112-13.[3]
Approximately one year after Evans joined the JISP, around holiday or vacation time, Coleman came into the office and kissed Evans on the cheek. See Derry Cert. Ex. C, Evans Dep. at 122. Evans did not object and did not report it to anyone in the AOC, although she mentioned it to certain co-workers. See id. On three other occasions, after either Evans or Coleman had been absent for a period of time, Coleman kissed Evans on the cheek. She never objected. See Derry Cert. Ex. C, Evans Dep. at 124. Often during office celebrations, JISP staff hugged each other as an expression of friendship. See Coleman 56.1 Statement ¶ 44. Once on Evans' birthday, after Coleman kissed her on the cheek, Evans told him not to do so. See Derry Cert. Ex. D, Evans Dep. at 139. She did not report the unwelcome birthday kiss to anyone at the time. See id.
Evans and Coleman interacted socially on occasion. At some point early in Evans' tenure, Evans attended a birthday party for Coleman at his home. She also attended Coleman's wedding. See Coleman Ex. FF4, Evans Dep. at 79-81; Coleman 56.1 Statement ¶ 55.
In June 1995, a JISP "volunteer-mentor," who is not a party in this matter, tried forcibly to kiss Evans, who resisted his advance. See Evans Ex. M, Evans Dep. at 85.[4] The volunteer-mentor had previously expressed interest in Evans, who had made it clear that she was not interested in a social relationship. See id.
Evans alleges that Coleman made light of the incident when she reported it to him. Upon receiving Evans' written complaint, Coleman emerged from his office and joked to other staff members that he had told them not to put a "desperate sign" on Evans' back. Id. Coleman further stated "I can't help it if you are so voluptuous, maybe he was trying to get his tongue in between your gap," or words to that effect. Evans Ex. M, Evans Dep. at 85-86.
Following this exchange, on June 13, 1995, Evans wrote a memo to Coleman "[i]n light of what happened between [her] and a mentor," expressing "the need to have this address[ed] on a broader scope," and requesting that the entire office receive training in order to prevent a similar incident from occurring. Evans Ex. A. Defendant Hill was copied on the June memo, which made no reference to Coleman's comments. See id.
Upon learning of the mentor incident, Hill visited the Northern Region office to address the problem. He met with Evans and Coleman separately and directed Coleman to terminate the mentor. See Evans Ex. Q, Hill Dep. at 51, 53.[5] Hill understood that Evans felt that Coleman had not taken the incident sufficiently seriously and told Coleman to be careful about how he responded to future situations because his responses "could get him into trouble." Evans Ex. Q, Hill Dep. at 56. Hill did not, however, officially reprimand Coleman in writing. See Evans Ex. R, Hill Dep. at 80. To address Evans' concerns, Hill set up a *581 special sexual harassment training session, which was held in October 1995. See Evans Ex. Q, Hill Dep. at 50-51, 53.[6]
Evans alleges that Coleman made other sexually inappropriate remarks. At some point in time, upon hearing Evans sneeze, Coleman inquired who had sneezed and commented that the loudness of a person's sneeze correlates with the noise he or she makes during intercourse. See Evans Ex. JJ, Crawford Dep. at 43; Ex. NN, Griggs Dep. at 29. One JISP employee testified that Coleman made the "sneeze joke" frequently when female staff members would sneeze. See Evans Ex. OO, Griggs Dep. at 30. Coleman also once described a visit to a nude beach and compared the size of his genitalia to that of other men on the beach. See Evans Ex. LL, Crawford Dep. at 47; Ex. PP, Padilla Dep. at 42. Evans also alleges that Coleman joked about the breasts of another woman in the office. See Evans 56.1 Statement ¶ 40; Evans Ex. QQ, Padilla Dep. at 77.
At some point in 1995, Evans was engaged in a work-related conversation near her desk with other JISP staff members, including William Clemons. Earlier in that year, Clemons and Evans had been involved in an intimate relationship that had since ended. See Derry Cert. Ex. A, Clemons Dep. at 62.[7] Coleman approached the group and commented that Clemons and Evans should "get a hotel room" and gestured as if to hand them money to pay for it. See Evans Ex. TT, Clemons Dep. at 64.
During 1995 and 1996, Evans and Coleman had numerous disputes concerning Evans' attendance and job performance. In a memo dated July 31, 1995, Evans expressed her displeasure about Coleman's comments following the mentor incident. See Evans Ex. N. She further complained about a July 27, 1995 memo from Coleman concerning the "chain of command." In that July 27 memo, Coleman had reprimanded Evans for contacting Coleman's supervisors about a dispute between Evans and a female clerical worker, Betsy Fermaintt, without having first contacted Coleman. See Evans Exs. N, T. In the July 27 memo, Coleman also suggested that Evans obtain further training on her supervisory skills. See Evans Ex. T. In her response, Evans noted that she had contacted the Union about how to improve her supervisory skills. See Evans Ex. N.
In November 1995, Coleman received a computer printout that indicated that Evans had expended all of her vacation and administrative leave for the year, along with all but 3.5 hours of her sick leave. See AOC 56.1 Statement ¶ 32. After learning of that information, Coleman sent a memo to Evans, dated December 27, 1995, requesting that she "[p]lease endeavor to manage [her] time closer in 1996." AOC 56.1 Statement ¶ 33; Battle Cert. Ex. L. Coleman acknowledged that "emergencies do occur" and wished Evans "a healthier *582 year in 1996." Battle Cert. Ex. L. Coleman sent a similar memo to Theresa Ballard, a Principal Clerk Typist at the JISP, who had expended all of her leave time. See AOC 56.1 Statement ¶ 34.
In a memo dated January 3, 1996, Coleman explained to Evans that his request regarding her time management had stemmed from the printout he had received from the personnel department. See AOC 56.1 Statement ¶ 35; Battle Cert. Ex. N. Coleman further explained that protocol required Evans to telephone him when she would not be at work, and that Coleman had been telephoning Evans at home in an effort to contact her when she was not at work, but had not telephoned in. See AOC 56.1 Statement ¶ 36.
Evans complained that Coleman unnecessarily telephoned her at home concerning her schedule and took away some of her responsibilities. Specifically, Evans charged that Coleman no longer permitted her to manage the office calendar, to submit official time sheets to the JISP administrative office, or to proofread Northern Region JISP reports. See Battle Cert. Ex. O. These concerns were addressed initially at a meeting on January 11, 1996 among Evans, defendant Goldstein, and AOC Administrative Assistant Edward Miklosey. Evans conceded that the telephone calls were all work-related, but felt that others in the office could have provided Coleman with the information he had requested. See AOC 56.1 Statement ¶ 40.
At a subsequent meeting among Coleman, Evans, and Miklosey, on January 22, 1996, Coleman agreed to reinstate the three job functions that had been taken away. See AOC 56.1 Statement ¶ 39; Battle Cert. Ex. P. Evans agreed to make every reasonable effort to perform her duties five days each week. In the event that Evans was absent, Coleman agreed to try to obtain any information he needed from people in the office, rather than by phoning Evans' home. See Battle Cert. Ex. P; AOC 56.1 Statement ¶ 41.[8]
Following that meeting, which ended at 11:00 a.m. in Trenton, Evans did not return to work in Jersey City. She was absent the following day as well. Coleman issued a memorandum, dated January 23, 1996, requesting an explanation for her absence. See Battle Cert. Ex. Q. In her January 25, 1996 response, Evans explained that she was under the impression that "clerical staff has always been excused after a field day," and that she had submitted to Coleman a request for a personal day on the second day. Evans Ex. Z. Evans further complained about inappropriate remarks that Coleman had made in the office, and copied Hill on this memo. See id.
On February 1, 1996, Coleman notified Evans that she would be docked pay for nine absences in December 1995, taken in excess of her leave time. See AOC 56.1 Statement ¶¶ 47-48; Battle Cert. Ex. S. Once again, Theresa Ballard, who was also absent in December following the exhaustion of all of her leave time, received a similar memo. See AOC 56.1 Statement ¶ 49; Battle Cert. Ex. T.
By fax dated February 2, 1996, Evans contacted defendant Battle about Coleman's actions. See Battle Cert. Ex. U. In her note to Battle, Evans stated that she viewed Coleman's "constant reminders as harassment" and noted that Coleman had taken away certain of her job responsibilities. Id. On February 5, 1996, Evans notified Battle that she intended to file a formal complaint against Coleman. See AOC 56.1 Statement ¶ 52; Evans Ex. AA.[9]
*583 On March 28, 1996, Evans had another altercation with Betsy Fermaintt, the clerical employee in the AOC with whom she had had a history of difficulties. Evans called the Jersey City Police into the office. See Derry Cert. Ex. B, Evans Dep. at 120. Coleman told the police that Evans was the problem and that she had been harassing Fermaintt for years. See id. Evans also states that Coleman told her that he would ask Hill to transfer Evans to another office because of her problems with Fermaintt. See id.
That day, Evans filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). See Battle Cert. Ex. W. The EEOC complaint described the mentor incident, Coleman's response, and accused Coleman of having made offensive jokes and comments in the office throughout the course of Evans' JISP tenure. She further complained that Coleman's job-related reprimands beginning in July 1995 were in retaliation for her complaint about his improper comments. See id.
On or about March 29, 1996, following the Fermaintt incident, Evans, who resided in Newark, was transferred to the Newark office of the JISP, where she was no longer under Coleman's supervision. See AOC 56.1 Statement ¶ 54; see also Battle Cert. Ex. W (EEOC complaint listing Evans' Newark address).[10] Evans remained a Secretarial Assistant III in the Newark office.[11]
On April 12, 1996, Evans filed a formal, internal sexual harassment complaint against Coleman with the EEO/AA. See Evans Ex. GG.[12] This complaint alleged harassment commencing prior to Evans' employment, including two visits to her home uninvited. She alleged that while employed, Coleman had altered Evans' time sheets and spoken to the payroll department about Evans' attendance. She further stated that Coleman had telephoned her residence five times on one day, and hung up when her boyfriend answered. She alleged that Coleman had inquired whether Evans was interested in meeting a friend of Coleman's at the friend's hotel. She further stated that Coleman "made remarks in regards to sex constantly," including jokes at her expense in front of the staff, and related Coleman's nude beach and sneeze comments, as well as the comment to her and Clemons suggesting that they get a hotel room. She also alleged that Coleman had told her that if he were to have an affair with anyone in the office, it would be with Evans. See Battle Cert. Ex. X.
Evans' complaint triggered an internal investigation, conducted by Judiciary Investigator Luis F. Nieves under Battle's supervision. See AOC 56.1 Statement ¶ 23; Battle Cert. Ex. Y. Nieves interviewed Evans and Coleman, along with numerous JISP employees whom Evans identified as potential witnesses. See Evans Ex. HH. During the course of this investigation, on or about May 15, 1996, the AOC was served with a copy of Evans' March EEOC complaint. See AOC 56.1 Statement ¶ 57. The report from the internal investigation, dated May 20, 1996, concluded that Evans' "allegations of sexual misconduct and discrimination" on the part of Coleman were "unsubstantiated." Evans Ex. HH at 2.
In April 1997, one year after Coleman's termination, Evans' transfer to the Newark *584 JISP office, and the report of the internal investigation, defendant Hill telephoned Evans to inform her that certain people were to be transferred to the Juvenile Justice Commission ("JJC") within the state's Division of Law, and to inquire whether Evans would be interested.[13] Evans told Hill that she would be interested, and was transferred to the JJC as a Secretarial Assistant III, the same position she held with the JISP. See Evans Dep. at 9-10 (attached to AOC Reply Br.). Evans complains that she has received little work at the JJC as retaliation for her harassment complaints at the AOC, of which the JJC was aware. See Evans 56.1 Statement ¶¶ 49-52.

DISCUSSION

I. Standard for Summary Judgment

Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the nonmovant. See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir.1994); National State Bank v. Federal Reserve Bank of N.Y., 979 F.2d 1579, 1581 (3d Cir.1992).
Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. See Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed.R.Civ.P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be `no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir.1992) (quoting Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548).
In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferencesincluding on issues of credibilityin favor of the nonmoving party. See Watts v. University of Delaware, 622 F.2d 47, 50 (3d Cir.1980).

II. LAD Claims and the Pretrial Order

As a preliminary matter, this Court must determine the fate of Evans' LAD claims, which were not designated in the pretrial order among "Plaintiff's Legal Issues" to be contested at trial. Defendants contend that the omission constitutes a waiver of all LAD claims. Evans concedes the claims' omission, and urges the Court to excuse the oversight and permit her to pursue them.
"The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e); see also Petree v. Victor Fluid Power, *585 Inc., 831 F.2d 1191, 1194 (3d Cir.1987). Absent a showing of manifest injustice, the decision to allow a party to amend a final pretrial order is within this Court's sound discretion. See Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co., 59 F.Supp.2d 408, 411-12 (D.N.J.1999).
It would be manifestly unjust to compel Evans to proceed without the LAD claims. The exclusion of the LAD claims would, in large part, vitiate Evans' case because the standards for employer liability under the LAD are broader, see generally Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), and the LAD alone permits her to pursue claims against the individual defendants. Compare Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir.1996) (no individual liability under Title VII) with Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 126 (3d Cir.1999) (LAD permits individual supervisory employee liability under aiding and abetting theory). Moreover, defendants concede that they will suffer no prejudice from amending the pretrial order to include the claims as violations of the LAD were pled in the complaint, and extensive discovery took place under the presumption that the LAD claims remained active. In light of the unfairness to Evans and the lack of prejudice to defendants, Evans may supplement the pretrial order to incorporate her claims under the LAD. See Pharmaceutical Sales, 59 F.Supp.2d at 412 (considering lack of prejudice or surprise to non-moving party in permitting modification to pretrial order to amend counterclaim).[14]

III. Hostile Work Environment

Evans has brought claims under Title VII and the LAD in connection with Coleman's alleged harassment. As the complainant, Evans bears the burden of establishing a prima facie case of sexual harassment. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F.Supp. 614, 617-18 (D.N.J.1998) (discussing Title VII and the LAD).

A. Title VII

Title VII forbids an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "It is well established that a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999) (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).
The Court of Appeals for the Third Circuit has enunciated five factors that must be shown to establish the existence of an actionable hostile work environment: "(1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Kunin, 175 F.3d at 293 (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990)). Defendants are entitled to summary judgment if they show that no genuine issues of material fact exist as to a plaintiff's failure to establish any of these five factors.[15]
*586 In considering whether a hostile environment exists, this Court should consider the totality of circumstances, "including the `frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.'" Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Title VII provides no redress, however, for the "innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex ... it forbids only behavior so objectively offensive as to alter the `conditions' of the victim's employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

B. The LAD

The LAD was enacted to eradicate the "cancer of discrimination." Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993) (citations omitted). As with Title VII, sexual harassment is a form of discrimination prohibited by the LAD. See id. at 601, 626 A.2d 445. Although the New Jersey Supreme Court frequently looks to Title VII jurisprudence in interpreting the LAD, see id. at 600-01, 626 A.2d 445, it has adopted a slightly broader test than that of the Third Circuit for hostile environment harassment. To state a hostile environment claim under the LAD, Evans must show that: "the complained-of conduct (1) would not have occurred but for [her] gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04, 626 A.2d 445.[16]

C. Prima Facie Case

Evans contends that Coleman created a hostile work environment by badgering her to commence a social relationship, touching her hand and kissing her inappropriately, and making sexually offensive remarks.[17]
A significant portion of Evans' evidence concerns the time prior to Evans' employment, but following her interview with Coleman. She has presented evidence that during this time, Coleman repeatedly expressed interest in a personal relationship with Evans, visited her home uninvited, and tried to hold Evans' hand.[18] Defendants *587 suggested at oral argument that this evidence is not relevant to the present inquiry, but did not provide a sufficient basis for this Court to reject this evidence either at argument or in their written submissions.
This Court has not uncovered any precedent deciding whether evidence of post-interview but pre-employment harassment may be considered as part of a prima facie case. In the absence of any authority to the contrary, this Court finds that such evidence is relevant and may be considered in the hostile environment inquiry.
Several factors prompt this result. First, as noted earlier, a determination of a hostile environment is based on an examination of the totality of circumstances. Post-application, pre-hiring events may very well influence an employee's experience on the job, her perception of the workplace environment, and her sense of what is expected of her at work. The relevance is particularly clear here, where one of the alleged incidentsColeman taking Evans' hand at the basketball game occurred when Coleman brought Evans to a work-related event to offer her some insight into the JISP.
The prohibition on employers' consideration of age, race, religion, sex, disability, or other protected status in making hiring decisions lends further support to considering pre-hiring evidence in this hostile environment case. These cases make clear that unlawful employment action that runs afoul of Title VII can occur prior to the creation of an official employment relationship. See, e.g., EEOC v. Metal Serv. Co., 892 F.2d 341, 343-44, 348-49 (3d Cir. 1990) (considering evidence of black applicants' efforts to obtain employment, although they were never interviewed, and finding prima facie case of racial discrimination established).
Courts frequently consider evidence of post-application, pre-hiring conduct in evaluating a plaintiff's showing. In Olson v. General Elec. Astrospace, 101 F.3d 947 (3d Cir.1996), for example, the court scrutinized the conversation held during the plaintiff's interview and found that that evidence precluded summary judgment. Olson had previously been employed by the defendant, GE, and had taken a medical leave of absence to treat his depression. Soon after he returned to work, he was laid off in a general workforce reduction. See id. at 949. A year later, Olson applied for a job opening at GE. His interviewer and former supervisorquestioned Olson extensively on the state of his health, specifically inquiring into his medication and hospitalization. See id. at 949-50. The Third Circuit found these interview-phase discussions probative of whether GE ultimately refused to hire Olson because they perceived him to be disabled, a decision that would violate Title VII. See id. at 954-55. Here, Evans' post-interview, pre-hiring encounters with Coleman, her interviewer, cannot be divorced from the application process itself. Furthermore, this Court cannot say as a matter of law that Coleman's interactions with Evans did not influence the decision to hire her.
Finally, the law makes clear that an employer may not refuse to hire an applicant who refused to accede to the sexual advances of her interviewer and potential supervisor. See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any ... applicant[ ] for employment ... because he has opposed any practice made an unlawful employment practice [under Title VII]."). To refuse to consider such incidents in determining whether a hostile or abusive work environment existed would be incongruous. Accordingly, evidence of post-interview, pre-employment incidents between Coleman and Evans may be considered in assessing *588 whether Coleman created a hostile or abusive environment.[19]
Evans also alleges that several incidents, which occurred during the course of her employment, constitute sexual harassment. She has introduced evidence that Coleman kissed her on the cheek on four occasions without Evans ever objecting. At least three of those incidents occurred upon the return of either Coleman or Evans from an extended absence. Once, in keeping with general office practice, Coleman gave Evans a kiss on her cheek on her birthday. Coleman 56.1 Statement ¶ 44; Derry Cert. Ex. D, Evans Dep. at 139. This time, Evans objected. See id. No evidence indicates that Coleman attempted to kiss her after she had asked him to stop.
Evans also alleges that Coleman made several sexually inappropriate comments in the office. Her primary complaint concerns Coleman's response to the mentor incident.[20] Evans testified at her deposition that, upon learning that a mentor had tried forcibly to kiss her, Coleman joked that he had told other staff members not to put a "desperate sign" on her back. Evans Ex. M, Evans Dep. at 85. She testified that Coleman continued to make light of the assault in a sexually inappropriate manner by stating that the mentor could not help himself because Evans was "so voluptuous" and that the mentor was probably attempting to get his tongue in Evans' "gap."[21]Id. at 85-86.
Evans states that Coleman made other sexually inappropriate remarks as well. She has put forth evidence that on one occasion, after Evans sneezed, Coleman joked to the staff that the noise a woman makes while sneezing correlates with the noise she makes during intercourse. See Derry Cert. Ex. B, Evans Dep. at 93; Evans Ex. NN, Griggs Dep. at 29. There is also evidence that Coleman suggested that Clemons and Evans leave the office to "get a room" and took money from his wallet as if to pay for it. Evans Ex. TT, Clemons Dep. at 63-64.
Evans has also alleged that other comments by Coleman contributed to the creation of a hostile environment. Specifically, she states that Coleman commented about his visit to a nude beach, comparing his physical attributes to those of other beachgoers, and that he commented about the breasts of a female JISP staff member. See Evans 56.1 Statement ¶¶ 39, 40. There is no record evidence, however, to suggest that Evans was present for these comments, or that they impacted her work environment in any way.
First, with regard to the nude beach comment, Evans has offered the testimony of two co-workers, Wendell Crawford and Frank Padilla. Although these individuals testified that they heard the remark and that others were present, neither recalled Evans' presence for the comment. See Evans Ex. LL, Crawford Dep. at 47, Ex. PP, Padilla Dep. at 42. Evans has thus offered nothing to demonstrate the relevance of this comment to her experience at the JISP. Similarly, there is nothing to suggest that Coleman's comments about another JISP staff member's breasts impacted Evans' work environment in any way. To support this allegation, Evans has appended a lone page of testimony from Padilla's deposition in which he recalled Coleman joking that following Valencia Sheerer's breast reduction surgery, her breasts were not as large as they had been. See Evans Ex. QQ, Padilla Dep. at 77. No evidence connects Evans to this comment in any way.
*589 This Court recognizes that in certain situations, evidence of harassment of other women may be probative. See Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110-12 (3d Cir.1999); Lehmann, 132 N.J. at 608, 626 A.2d 445. Indeed, in Lehmann, the New Jersey Supreme Court expressly held "that the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct." Lehmann, 132 N.J. at 611, 626 A.2d 445.
The circumstances in which evidence of other harassment is pertinent, however, are not present here. In Hurley, the Third Circuit affirmed the trial court's admission of evidence of harassment of other female employees. It explained, by way of example, that a plaintiff could demonstrate that her working conditions were "altered as a result of witnessing a defendant's hostility towards other women at the workplace." Hurley, 174 F.3d at 110 (citing Lehmann, 132 N.J. at 611, 626 A.2d 445).
Other than her reference to secondhand accounts in her submissions on this motion, no evidence links Evans herself to these two comments. Thus, nothing before this Court suggests that Evans' working conditions were altered from "witnessing" Coleman's alleged sexual harassment of others.
Hurley also explains that even where the plaintiff did not have personal knowledge of instances "of harassment or pervasively sexist attitudes," evidence of harassment of others might be relevant in considering whether the employer's asserted reasons for its actions were, in fact, a pretext for discrimination. See Hurley, 174 F.3d at 110. Evans, however, must first establish her prima facie case before this Court may consider evidence of pretext or notice to the employer. Without any evidence of a connection to Evans, her general references to two statements alleged to have been made by Coleman outside of her presence are not probative of whether Evans' work environment was hostile or abusive. See Lehmann, 132 N.J. at 611, 626 A.2d 445 (noting that a plaintiff's perception of a hostile environment will "be reinforced if she witnesses the harassment of other female workers").[22]
The totality of the evidence of sexual harassment thus consists of rebuffed advances in 1993, prior to Evans' employment; four or five kisses on the cheek on special occasions or after extended absences without objection over several years, and no kisses after Evans asked Coleman to refrain; Coleman's two remarks joking about the mentor incident; Coleman's comment in 1995 to Evans and Clemons; and, two general remarks made in the presence of others connecting sneezing and intercourse and describing Coleman's visit to a nude beach.[23] These alleged *590 events occurred over the course of several years. Evans has presented no evidence of any temporal relationship among them.
Drawing all reasonable inferences in Evans' favor, this Court finds that no reasonable juror could conclude that these few scattered events over such an extended period of time constituted pervasive harassment. Evans' failure to show "regular and pervasive" objectionable conduct entitles the AOC to summary judgment under Title VII. This Court further finds that no reasonable juror could conclude that these events were sufficiently "severe or pervasive" such that a reasonable woman would consider the working environment hostile. Evans has thus failed to establish a prima facie case of hostile environment sexual harassment under either Title VII or the LAD. Defendants' requests for summary judgment on those claims are granted.[24]

IV. Other Discrimination

A. Quid Pro Quo Harassment

Evans also contends that she suffered quid pro quo harassment because Coleman made clear "if she did not go along, she would find things more difficult." Tr. of Oral Arg. at 39; see also Pretrial Order at 7. In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court, considering the standards for employer liability for sexual harassment under Title VII, "largely eliminated the distinction between hostile work environment claims and quid pro quo claims, focusing instead on the presence or absence of tangible adverse employment actions." Hurley, 174 F.3d at 120.
In any event, Evans has not articulated a clear theorylet alone put forth competent evidenceto suggest that any employment benefits were explicitly or implicitly conditioned on her submission to unwanted sexual advances or requests for sexual favors. See generally Bonenberger v. Plymouth Twp., 132 F.3d 20, 27 (3d Cir.1997) (describing elements of quid pro quo harassment); Lehmann, 132 N.J. at 601, 626 A.2d 445 (articulating a nearly identical standard under the LAD); see also Hurley, 174 F.3d at 121 n. 19 (opining that New Jersey might retain quid pro quo cause of action under the LAD after Ellerth and Faragher). Evans rebuffed Coleman's alleged advances in 1993, prior to her employment. The difficulties she alleges that she faced as a result of her refusal to accede to these overtures did not occur until well into 1995, after nearly two years of employment. The unreasonable inference that a connection existed between these temporally distinct events is insufficient to create a genuine issue of material fact. Accordingly, defendants' motions for summary judgment are granted on any and all claims premised on a quid pro quo theory of liability.

B. Retaliation

Evans does not allege that she was retaliated against for complaining about Coleman. Her references to retaliation are couched in an argument that the AOC should not be permitted an affirmative defense to sexual harassment because she suffered a tangible adverse job consequence by being the subject of "write-ups" and a transfer first to Newark and then to the JJC. See Pretrial Order; Pl.Br. in Opp'n to Motions for Summ.J.[25]
To the extent a retaliatory transfer claim was intended but simply inartfully drafted, it fails as well. In order to establish a prima facie case of retaliation, *591 Evans must show that (1) she engaged in a protected employee activity; (2) the AOC took an adverse employment action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the AOC's adverse action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.2000). Once a prima facie case has been established, the AOC must articulate a legitimate non-discriminatory reason for Perry's termination. See Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir.2000) (quoting Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir.1999)). The burden then shifts back to Evans to show that the articulated "legitimate" non-discriminatory basis for her termination was merely a pretext for discrimination. See id.; see also Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 198-99 (3d Cir.1996) (applying identical standard to LAD retaliation claim).
Evans has not established a prima facie case of retaliation. As an initial matter, any allegation of retaliation stemming from Coleman taking away certain of her duties fails quickly. It is undisputed that those tasks were reinstated promptly once Evans complained, and that those events occurred before Evans expressed her intention to file an official complaint. Likewise, any suggestion that Evans' transfer to Newark was retaliation for resisting Coleman's overtures or filing a complaint would fail as well. Hill ordered Evans' transfer to Newark two weeks before she filed her internal EEO/AA complaint. And, while Evans filed her EEOC complaint on March 28, 1996, the day of her altercation with Betsy Fermaintt and the day before her transfer, the undisputed record reveals that the AOC did not learn of her EEOC filing until May 15th of that year. Furthermore, Evans was transferred to the same position, with no change in pay, at an office closer to her home, and where she would not have to interact with Coleman, with whom she was having problems, which leads the Court to question whether the transfer could even be termed "adverse employment action." See generally Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").[26]
Finally, any retaliation claim grounded in Evans' experience at the JJC is equally untenable. One year after her complaints were filed, and Coleman was fired, Evans expressed an interest in a transfer to the JJC. She contends, however, that upon transferring, she was given no work in retaliation for her complaints at the JISP. See Evans 56.1 Statement ¶ 49. This Court notes that the two agencies fall within different departments of the state government and that neither the JJC nor any of its employees are parties to this lawsuit.
At its root, Evans' complaint stems solely from the fact that JJC Director, Gregory D. Wilcenski, was the JISP's acting director between January 6, 1996 and March 26, 1996, while Hill was on sick leave. See Evans 56.1 Statement ¶ 50-51. During that time, Evans copied Hill on her January 25, 1996 memorandum to Coleman explaining her absence following the Trenton meeting and complaining about certain remarks Coleman had made that she felt were inappropriate. See id. ¶ 52.
*592 The record does reflect that Wilcenski served in Hill's stead during those months. See Evans Ex. ZZ, Hill Dep. at 18. The record further reflects that Hill and Wilcenski never discussed Evans at any point, that Wilcenski was not involved with the JISP when Evans lodged her formal complaints, and that Wilcenski followed up on Evans' complaints about her workload at the JJC. See id.; Evans Ex. XX, Wilcenski Dep. at 26-28. It appears that beyond groundless speculation, the record is utterly devoid of any facts from which a causal connection may be drawn between Evans' complaints at the AOC and her workload over a year later at the JJC. Evans has thus failed to establish a prima facie case.[27] Defendants' motions for summary judgment are granted.[28]

V. Sanctions

Finally, Evans and Coleman have cross-moved for sanctions and attorney's fees, although they do not indicate the Rule pursuant to which they have made their requests. Evans maintains that Coleman should receive sanctions for filing a false affidavit. Meanwhile, Coleman's counsel asserts that sanctions should be imposed on Evans' counsel for implying that she improperly altered Evans' portion of the pretrial order to exclude the LAD claims. This case has a voluminous record and has been vigorously litigated since its inception, and this Court will not ascribe any malfeasance to any party. Both motions are denied.

CONCLUSION
For all of the foregoing reasons, defendants' motions for summary judgment are granted. The requests of Evans and defendant Coleman for sanctions and attorney's fees are denied.
NOTES
[1] Federal jurisdiction exists, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C 2000e-5(f)(3). This Court may exercise supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367(a).
[2] Battle was incorrectly named in the complaint as Robert E. Battle.
[3] It appears that Evans was deposed on November 3, 1998, January 21, 1999, and March 9, 1999, and that the pagination of the second and third days' transcripts is not consecutive to the prior transcript. The Certification of Douglass L. Derry appends excerpts from the November session at Exhibit B, from the January session at Exhibit C, and from the March session at Exhibit D. The excerpts of Evans' deposition included in Evans' and Coleman's submissions do not indicate the date on which the testimony was given.
[4] Volunteer-mentors are individuals who work with JISP teams to serve as role models and to assist the supervision and rehabilitation of the juveniles in the program. See Tr. of Oral Arg. at 32.
[5] The record is unclear as to whether Hill learned of the incident before receiving a copy of Evans' memo, and as to precisely when he visited the office and ordered the mentor's termination. It is also unclear as to the exact date on which the mentor incident occurred.
[6] Evans argues that Hill testified that he and others at the AOC intended to ignore her concerns. This strained reading of Hill's testimony, based on an obvious transcription error, is untenable. It is clear that a special training session was held specifically to avoid ignoring Evans' concerns. See Evans Ex. Q, Hill Dep. at 50-51, 53, 55-56. Although this Court must draw all reasonable inferences in Evans' favor on this motion for summary judgment, the inference Evans urges from Hill's testimony is wholly unreasonable and shall not be indulged.
[7] Evans argues that evidence concerning her relationship with Clemons should be excluded under Federal Rule of Evidence 412, which, in cases involving alleged sexual misconduct, bars the admission of evidence of a victim's past sexual behavior to prove that the victim engaged in other sexual behavior or has certain sexual predispositions. The Court has only considered the information about the relationship to provide context for Coleman's alleged inappropriate remark. It has not been considered as evidence of any sexual predisposition or behavior of Evans, and therefore this consideration does not run afoul of Rule 412. See Fed.R.Evid. 412(a); see also Philbin v. Trans Union Corp., 101 F.3d 957, 960 n. 1 (3d Cir.1996) (noting that evidence that would not be admissible at trial "could not be considered on a motion for summary judgment").
[8] At a contemporaneous meeting between Coleman and Goldstein, Coleman admitted that he had called Evans' home on multiple occasions to determine if she was, in fact, at home. See Evans Ex. JJJ, Goldstein Dep. at 67-68.
[9] Evans did not file a formal, internal EEO/AA complaint until April 12, 1996. See AOC 56.1 Statement ¶ 59; Evans Ex. GG.
[10] Somewhere during this time period, Evans filed a municipal court complaint against Fermaintt. The judge in that proceeding had made it clear that the two women were to be separated and have no contact. See Battle Cert. Ex. B, Evans Dep. at 123. It appears that Evans informed Hill of this fact. See id.
[11] At oral argument, Evans originally contended that although her title remained the same, her job responsibilities decreased upon the transfer. Subsequently, her counsel conceded that there is no record evidence to reflect the alleged diminution in responsibility. See Tr. of Oral Arg. at 68.
[12] Coleman was terminated at some point in April 1996 for reasons unrelated to Evans' complaint. See AOC 56.1 Statement ¶ 54 note *.
[13] Neither the Division of Law nor the JJC is a party to this action.
[14] The pretrial order also failed to enumerate certain plaintiff's exhibits that were included in Evans' summary judgment opposition. In accordance with the schedule set forth by the Court at oral argument, Evans may propose the additional exhibits to defendants and amend the pretrial order to include those items. Magistrate Judge Haneke shall rule on any defense objections.
[15] It is beyond dispute in this Circuit that individual employees cannot be held liable under Title VII. See Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir.1996). Accordingly, summary judgment is granted with respect to Evans' Title VII claims against defendants Coleman, Battle, Hill, and Goldstein.
[16] The Lehmann court expressly rejected the more extreme "regular and pervasive" test set forth by the Third Circuit in Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir.1990), in favor of a disjunctive "severe or pervasive" requirement. See Lehmann, 132 N.J. at 606-07, 626 A.2d 445. The Lehmann court reasoned that a "regular and pervasive" requirement was inconsistent with developments in Supreme Court Title VII jurisprudence, and would improperly "bar actions based on a single, extremely severe incident or, perhaps, even those based on multiple but randomly occurring incidents of harassment." Id. at 606, 626 A.2d 445. Although one court in this District has stated that the Andrews "pervasive and regular" test is no longer the governing standard for Title VII cases in this Circuit, see Domm v. Jersey Printing Co., Inc., 871 F.Supp. 732, 739 n. 4 (D.N.J.1994), the Third Circuit has recently cited Andrews with approval in Kunin, cited in Part III(A), supra, and Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir.1997).
[17] Evans' allegation that Coleman retaliated against her when she rejected his advances will be addressed in Part IV(B), infra.
[18] Coleman has endeavored to discredit Evans' testimony by presenting conflicting evidence. This evidence, however, simply goes to the credibility of Evans' version of the events, and the weight a juror might accord it. On this motion for summary judgment, all reasonable inferences, including those on credibility, must be drawn in Evans' favor. See Watts v. University of Delaware, 622 F.2d 47, 50 (3d Cir.1980).
[19] Of course, the evidence, before any ultimate consideration here, must be otherwise admissible.
[20] Evans does not allege that the mentor incident itself contributed to a hostile environment. See generally Pretrial Order at 5-9.
[21] This appears to be a reference to a gap between Evans' teeth. See Tr. of Oral Arg. at 32.
[22] Evans has presented no evidence whatsoever to support her remaining allegations of inappropriate conduct and comments by Coleman. In her internal EEO/AA complaint, Evans charged that Coleman telephoned her house repeatedly and hung up when Evans' boyfriend answered, and that Coleman had told her that if he were to have an affair with anyone in the office it would be with Evans. See Battle Cert. Ex. X. In addition, Evans claimed that Coleman informed Evans that he had a friend visiting and asked Evans if she would be interested in meeting the friend at the friend's hotel room. See id. There is no competent evidence to support these allegations no affidavits, no certifications, and no deposition testimony of Evans or any other witness regarding these events. As these allegations are utterly unsubstantiated, they cannot be considered as part of Evans' prima facie proof.
[23] The record contains several memoranda revealing that Coleman and Evans' relationship became strained and contentious beginning in the summer of 1995. In these memoranda, either Coleman or Evans expressed his or her displeasure with the other's job performance with one exception, no sexually inappropriate remarks were conveyed or discussed. Only the two memoranda allegedly written in response to Coleman's mentor remark are temporally connected to any allegations of harassment. See Evans Exs. A, N. The other memoranda are not connected to sexual harassment in any way. See, e.g., Evans Exs. T, U, W, Y, Z; Battle Cert. Exs. N, Q, R, S.
[24] Evans' failure to establish a prima facie case of harassment obviates the need to consider whether the AOC can lodge a successful affirmative defense under Title VII.
[25] Evidently, these write-ups are the work-related memoranda discussed in note 23, supra.
[26] Even if Evans had established a prima facie case on this claim (which, as the Court noted above, was scarcely implied in her submissions on this motion and not stated in the pre-trial order), summary judgment would be proper. The AOC has articulated a legitimate nondiscriminatory reason for her transfer: Evans and Fermaintt were frequently at odds, and because Evans lived in Newark, the AOC perceived Evans' transfer as the preferable course of action. See Tr. of Oral Arg. at 62. Evans has pointed to nothing to suggest that this rationale was a pretext for discrimination.
[27] In light of Evans' failure to establish a prima facie case of hostile environment or quid pro quo sexual harassment or retaliation, the Court need not consider the standards for individual supervisor liability under those theories.
[28] As this Court has granted summary judgment on Evans' federal claims under Title VII, it shall not consider Evans' pendent state tort claim for intentional infliction of emotional distress, and that claim is dismissed. See Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 195-96 (3d Cir.1976) (holding that where federal claims are disposed of on summary judgment, federal courts should not ordinarily entertain pendent state claims). Because Evans' LAD claims substantially overlapped with her Title VII claims, this Court considered their merits in tandem with its Title VII analyses, and determined that summary judgment on those claims was proper.